Argued March 1; modified March 22, 1938

In re Pottratz Estate
## SMITH *v.* POTTRATZ
(77 P. (2d) 436)

Department 1.

*John D. Williams*, of Portland, for appellant.

*J. Dean Butler*, of Oregon City (Butler & Jack, of Oregon City, on the brief), for respondent.

KELLY, J. The controlling question here is whether plaintiff has presented a prima facie case by corroborative testimony as to the material features of her demand, as required by statute: Section 11-504, Oregon Code 1930; *Seaton v. Security S. & T. Co.*, 131 Or. 261 (282 P. 556).

| | |
|---|---:|
| The claim as presented comprised automobile expenses for the years 1932 to 1936, both inclusive ..................................$ | 576.40 |
| Fees as business agent ......................................... | 950.00 |
| Canning and labor for the years 1931 to 1935, both inclusive ..................................... | 97.35 |
| Meat purchased and money advanced in the years 1933 to 1936, inclusive ...................... | 140.81 |
| | $1,764.56 |

The trial court allowed said claim in the aggregate sum of $938.16 comprising,—

| | |
|---|---:|
| Automobile expenses, 1932-1936 ...................$ | 300.00 |
| Fees as business agent ......................................... | 400.00 |
| Canning and labor, 1931-1935 .......................... | 97.35 |
| Meat purchased and money advanced ........... | 140.81 |
| | $ 938.16 |

In her case in chief no corroborative testimony was offered by claimant except that of Mrs. Hazel Fern Fredriksen, who testified that in December, 1935, or January, 1936, she negotiated with claimant to rent one of the houses owned by decedent and thereafter paid a month's rent thereon to claimant amounting to $15. This witness also testified that in renting the house to witness several trips were made by claimant. No corroborative testimony as to the reasonable value of such service was offered.

The testimony offered by the administrator contains statements of a very general nature to the effect that at times claimant transported deceased and his widow, that is claimant's parents, in her automobile at different times. The number of times is not given. The widow of deceased also admitted that claimant had brought them vegetables and other food products. Neither the amount nor value of these articles is given by any corroborative witness except as shown below in a question to which the widow of Mr. Pottratz assented.

A power of attorney was given by the deceased and his wife (now his widow) to claimant authorizing her to collect rents and receipt for them on behalf of her parents. There is no corroborative testimony as to the reasonable value of claimant's services as such attorney in fact, or as to the extent or amount of the collections made by claimant for her, or that any collection was made by claimant except the one from Mrs. Fredriksen. It is true that Mr. Wilgus D. Smith testified that claimant informed him that a foreclosure suit would be instituted by her father and that such suit was instituted.

We quote from the corroborative testimony bearing upon the services alleged to have been performed, the foodstuffs furnished, and the money advanced.

Mrs. Emma Pottratz, mother of claimant, testified on that phase of the case as follows:

"Q. Now, about the year 1932, Mrs. Smith began to drive you and Mr. Pottratz around?

A. Yes, that might be that she took us some places, yes.

Q. Did you have a regular arrangement that she should come in at particular days and take you to particular places?

A. No, not particular.

Q. No.

A. No.

Q. When would she take you out to these places?

A. When she had time that she could come in, she did.

Q. Usually when she came in on a visit?

A. Well, and then we did do business too, yes.

\* \* \* \* \*

Q. Just a moment, please; during the year 1931, she is charging your husband's estate with $18.95 for canning raspberries and blackberries and some miscellaneous farm produce: can you tell me anything about that?

A. Yes, she did can fruit for me, yes.

\* \* \* \* \*

Q. Don't you think Mrs. Smith did take you around to collect the rents and come out to our office to collect the interest and do those things?

A. Of course, then and now she did, yes.

Q. And that covered how many years, Mrs. Pottratz?

A. I don't know; I didn't keep no track of it.

Q. Well, just about how many years?

A. All I can tell you what Mrs. Smith wants; she wants to undress me, and she can't do it. Now, my son Paul worked there eight years for his board. Don't you think that is worth something?

Q. Was there ever any agreement, when Paul went there to work, that he would work to pay for the work that Mrs. Smith was doing?

A. Yes, that's what; that's what the understanding was, and now that papa passed away, she pitches in and turns it around, and I can't help that, folks.

\* \* \* \* \*

Q. That (referring to a conversation) was after Mrs. Smith had been collecting these rents for about three years, isn't that right?

A. I don't remember how many years; Mrs. Smith did come over there and did help us, and Paul did work for her over there.

Q. But she did collect the rents and help you, her father and you, for say five or six years at least, isn't that right?

A. I couldn't swear how much,—how many years, yes."

Referring to the property on which there was a mortgage in the name of witness Paul Pottratz, which property was owned by Mr. and Mrs. Smith, Paul Pottratz, brother of claimant, testified as follows:

"Q. And he would collect the rent with Mrs. Smith just the same as if it was his own property?

A. Yes, sir."

Mr. Wilgus D. Smith testified as follows:

"Q. Mr. Williams: (Interrupting.) We'll get back to 1932. Did you have any business dealings with Mrs. Smith at that time?

A. No.

Q. Did you in 1933.   A. No.

Q. When did you first have any business dealings with Emma Smith?

A. The only thing that I know of, what I would consider in the nature, it might have been, of business dealings, was in 1934, about two months prior to the time they foreclosed the mortgage; she came in there and said she wanted it paid.

Q. Wanted the mortgage paid?

A. Wanted the mortgage paid. When she came back later, about three weeks or four, later, and said that she was looking for the abstract, or something to that effect, and I asked her what she wanted with it, and she said she was going to foreclose the mortgage. That is the extent of my business dealings with her in connection with any of it.

\*      \*      \*      \*      \*

Q. That would be in 1934.   A. 1934, Yes."

On rebuttal, Mr. Franklin G. Pottratz, brother of the claimant, testified as follows: .

"Q. * * * Now, first, your sister just testified, for instance, from this little book that she kept a day-by-day account, which she read from in court,—she just testified that she thought you had seen her write some of the things down there at various times; do you know whether you did or not?

A. Oh yes, that little book; I have known that for three years, on and off.

&ast; &ast; &ast; &ast; &ast;

Q. Did he, (the decedent) say anything at those times about the number of trips that your sister Emma was making for them, or whether she was making regular trips, or not, or do you know?

A. No, I couldn't say; *she was making regular trips,* but he didn't mention it that way.

&ast; &ast; &ast; &ast; &ast;

Q. Do you know when that was that you talked with your father, Fred?

A. Along in 1931; away back in 1931, already.

Q. And do you know, at any subsequent time, any time after that that you talked to him, that anything was said by him about what he would pay her, either per mile or per year, or per month, or whatever he said about it, if he did say anything?

A. No, I just gave him my suggestion what he could do with sister, or they could set their own basis, but seven cents was standard at that time; of course, now, since the roads got together, it isn't quite seven any more. We used the same basis out in La Grande, and we hire cars there the same way; we have got our basis down now to five cents there, but as far as father making a basis, when we talked about her wages, that he could do it in a certain way,—'Well' he says, 'She gets a hundred dollars this year; that's what she gets.' I says, 'Listen, daddy you can't hire that girl for a hundred dollars.' I says, 'Listen, she has a home there, and she is at your mercy; when you want her, you will

call to her, and you can't sit and wait for her; when you want her, she comes; she has a tough proposition.' I says, 'Daddy, you can't have that set down for a hundred dollars under those conditions, and have her drive you, whenever you want her.' Well, then, in 1932, business got a little heavier, and we talked it over at that time again, and I was prodding him along, because things wasn't going to suit me, so then in 1932, 'Well,' he says, 'I have raised that.' I says, 'What did you raise it to?' 'A whole lot more;' and I says, 'You will have to give her more;' I says, 'What have you got it now?' 'Oh, I don't know; I says, 'Listen, daddy, if you can pay three hundred dollars to that girl, all right; if you can't, go down town and get somebody that will drive you around just when you feel like it.' I says, 'If she gets certain days, and you have got them cut and dried, that's one thing. I have come in here with a carload of stock, and Emma and Chester may have to be there all day, and at the same time, she might be there for an hour and would have to come right back, and that was her time all gone; she might be somewhere today, and somewhere else tomorrow morning.' If everything was right here where the estate was, it would be different, but I says, 'Listen, here, daddy, I ain't got my own car, and I have to take care of my car of stock.' When I had my car down here, practically every time I was here, I took the folks out on a drive, and they would pay me cash; if I would take them out, I would get cash.''

On cross-examination this witness further testified:

''Q. You came down in 1931, I think and discussed with your father this gasoline mileage, or this matter of Mrs. Smith.

A. Did I say '1931?'

Q. Yes, 1931, I think you said.

A. Did I mention 1931 awhile ago?

Q. You thought she ought to have seven cents a mile.

A. No, I didn't say what she ought to have; I told dad that we was using that rate of seven cents at that

time, and he could use his judgment what he wanted to do with her; I don't know what kind of a deal he made with her.''

In answer to the question of the court, witness Franklin G. Pottratz testified that in December, just before he died, deceased said, * * * "I am going to pay her, (claimant) and pay her more than she has got coming,'' etc.

"Q. I mean the fact that he would pay you and would pay everybody else, and yet apparently he never paid her a nickel during all these years, going over a period of 13 years.

A. 13? She wasn't working for wages then. She started back there when the folks got so they couldn't get around any more; it was in 1931 when she started doing the driving; she was just doing the driving then; and then in 1932, when it got a little more difficult, why they would send for her, and of course questions come up and they would foreclose this, and so and so, and in addition to that, why I began to see - - -

Q. (Interrupting) Yes, that would be just all. I wouldn't be here very long. Of course, he would give it to me (money for driving) but all told, I think your honor it would be less than $25.00,'' etc.

"Q. (By Mr. Jack.) I think you mentioned in your testimony but I want to ask you whether or not you have a distinct recollection of hearing your father ever say whether he intended and wanted to have Emma get paid for the work that she was doing?

A. Yes; that was in the fall, in December, and he also mentioned it in January, because that is the reason he was holding that money in January, when she wanted certain money; they had some kind of a deal they was trying to adjust, and I don't know what it was, and after they had tried it, I got dad to one side and explained to him that he should adjust those things. 'Well' he says, 'I haven't got it now, Frank, but I'll pay her everything she has got coming, and I'll see that she is well paid.' ''

He testified that decedent told him in 1931 that he, decedent, would pay claimant $100 for the services that year. Later, as above quoted, witness indicated that he was not referring to the year 1931 but 1932. At all events, as above quoted, he testified that for 1932, in effect, the decedent said he had raised claimant's pay to a sum in excess of $100. Claimant, however, has restricted her claim for that service in 1932 to $100 and she testified that there was no express agreement between her father and herself as to the amount to be paid for such service. We hold that the testimony of her brother Franklin G. Pottratz corroborates claimant upon the item for the year 1932, "Fees for time and labor in rendering the services as business agent." The express agreement to pay a definite sum constitutes evidence of reasonable value and we so treat it.

He testified to advice that he had given his father about the value of certain services and the amount allowed by his company and the state of Oregon as mileage in using an automobile, but he was not able to say how much service had been rendered or mileage driven by claimant.

He testified that at times he had seen his sister the claimant entering items in her account book from day to day and that his father had told him that he would pay claimant whatever was reasonable, in fact, more than the reasonable value of her services.

The foregoing comprises all of the corroborative testimony in the record.

■■ It was incumbent on claimant to make a prima facie showing by corroborative testimony the extent and value of her alleged services; the amount and reasonable value of meat, vegetables and other foodstuffs she claims to have furnished; the sums which were reason-

able to allow her as fees and commissions; and the amount of money advanced by her. This, she has failed to do, except as to the item of $100 referred to by Franklin G. Pottratz as having been agreed to by decedent and the item of $18.95 for vegetables furnished in 1931 and called to the attention of claimant's mother.

For these reasons the order and judgment of the circuit court is modified and this cause is remanded with instructions to enter an order amending and modifying the judgment of the circuit court to the effect that claimant have and recover judgment in the sum of one hundred dollars and in the further sum of $18.95, and her costs and disbursements in the trial court and upon this appeal and no more.

BEAN, C. J., and BELT and ROSSMAN, JJ., concur.